THIS OPINION IS A
PRECEDENT OF THE
TTAB

Hearing: April 25, 2014                                      Mailed: March 27, 2015

UNITED STATES PATENT AND TRADEMARK OFFICE

‗‗‗‗

Trademark Trial and Appeal Board

‗‗‗‗

*ProMark Brands Inc. and H.J. Heinz Company*

*v.*

*GFA Brands, Inc.*

‗‗‗‗‗‗

Opposition No. 91194974

Opposition No. 91196358

‗‗‗‗‗‗

Matthew J. Cavanagh, of McDonald Hopkins LLC for H. J. Heinz Company and ProMark Brands, Inc.

David R. Cross, Marta S. Levine, and Johanna M. Wilbert of Quarles & Brady LLP for GFA Brands, Inc.

‗‗‗‗‗‗

Before Rogers, Chief Administrative Trademark Judge, Ritchie, and Masiello, Administrative Trademark Judges

Opinion by Rogers, Chief Administrative Trademark Judge:

GFA Brands, Inc. ("Applicant") filed two applications to register the mark

SMART BALANCE, in standard character form, for goods identified as follows:

frozen appetizers containing poultry, meat, seafood or vegetables in International Class 29; frozen entrees consisting primarily of pasta or rice in International Class 30;[1]

soy chips and yucca chips; snack mixes consisting primarily of processed fruits, processed nuts, raisins and/or seeds; nut and seed-based snack bars in International Class 29; cake mix, frosting, cakes, frozen cakes, cookies, coffee, tea, hot chocolate, bread, rolls, crackers, pretzels, chips, snack mixes, spices, snack bars in International Class 30.[2]

ProMark Brands Inc. ("ProMark") opposed both applications and the Board consolidated the proceedings. Prior to trial, ProMark assigned its pleaded registrations to H. J. Heinz Company ("Heinz") and the Board joined Heinz with Promark (collectively "Opposers") as parties-plaintiff in the consolidated proceeding.[3]

The case is fully briefed.[4] An oral hearing was held on April 25, 2014 and was presided over by this panel.

---

[1] Application Serial No. 77864305, filed November 3, 2009, under Trademark Act § 1(b), 15 U.S.C. § 1051(b).

[2] Application Serial No. 77864268, filed November 3, 2009, under Trademark Act § 1(b), 15 U.S.C. § 1051(b).

[3] On June 30, 2011, ProMark moved to substitute Heinz for ProMark in the consolidated proceedings. ProMark attached a copy of the relevant assignment records from the USPTO's website in support of its motion. Construing the filing as a motion to join because the assignments occurred after commencement of both proceedings, the Board granted joinder. Board Order dated July 26, 2011 at 1 n.1, 17 TTABVUE. *See Drive Trademark Holdings LP v. Inofin,* 83 USPQ2d 1433, 1434 n.2 (TTAB 2007); Trademark Trial and Appeal Board Manual of Procedure ("TBMP") § 512.01 (2014). Record citations are to TTABVUE, the Board's publically available docket history system. *See Turdin v. Trilobite, Ltd.,* 109 USPQ2d 1473, 1476 n.6 (TTAB 2014).

[4] The Board previously set aside an order striking Applicant's final brief as untimely filed. Board Order dated April 11, 2014, 107 TTABVUE. The Board has considered all briefs filed in this matter.

## I.    Opposers' claims.

Opposers allege long and continuous use of the SMART ONES mark in the commercially successful marketing of a wide variety of frozen foods and ownership of the following federal trademark registrations for SMART ONES, in standard character form:[5]

| | |
|---|---|
| 1911590 | Frozen entrees consisting primarily of chicken, fish and/or vegetables in International Class 29.[6] |
| 2204080 | Frozen desserts consisting of milk based or milk substitute based desserts, cakes, pies and mousses in International Class 30.[7] |
| 2916539 | Pre-cooked ready-to-eat frozen bread or wrap having a meat and/or vegetable filling with or without cheese in International Class 30.[8] |
| 2916538 | Pizza in International Class 30.[9] |
| 3462182 | Frozen foods, namely, breakfast sandwiches and muffins in International Class 30.[10] |

---

[5] The mark depicted in Registration No. 1911590 is a typed drawing. Effective November 2, 2003, Trademark Rule 2.52, 37 C.F.R. § 2.52, was amended to replace the term "typed" drawing with "standard character" drawing. A mark depicted as a typed drawing is the legal equivalent of a standard character mark. Trademark Manual of Examining Procedure ("TMEP") § 807.03(i) (2014).

[6] Issued August 15, 1995; affidavit under § 8 accepted; affidavit under § 15 acknowledged; renewed.

[7] Issued November 17, 1998; affidavit under § 8 accepted; affidavit under § 15 acknowledged; renewed.

[8] Issued January 4, 2005; affidavit under § 8 accepted; affidavit under § 15 acknowledged.

[9] Issued January 4, 2005; affidavit under § 8 accepted; affidavit under § 15 acknowledged.

[10] Issued July 8, 2008; affidavit under § 8 accepted; affidavit under § 15 acknowledged.

Opposers claim that Applicant's SMART BALANCE mark, when applied to Applicant's identified goods, so resembles Opposers' earlier used and registered SMART ONES mark as to be likely to cause confusion, mistake or deception in violation of Trademark Act § 2(d), 15 U.S.C. § 1052(d). Opposers also claim that Applicant's mark is likely to dilute the distinctiveness of its unique and famous mark in violation of Trademark Act § 43(c), 15 U.S.C. § 1125(c).

## II. Applicant's answers and defenses.

Applicant denied the salient allegations of the Notices of Opposition and asserted various putative affirmative defenses in both proceedings.[11] Because Applicant did not pursue any affirmative defenses, either through presentation of evidence at trial or in its brief, any such defenses are waived. *Research in Motion Ltd. v. Defining Presence Mktg. Grp. Inc.*, 102 USPQ2d 1187, 1189-90 (TTAB 2012); *Swiss Watch Int'l Inc. v. Fed'n of the Swiss Watch Indus.*, 101 USPQ2d 1731, 1734 n.4 (TTAB 2012).

---

[11] Opposition No. 91194974, Answer of GFA Brands, Inc., 4 TTABVUE; Opposition No. 91196358, Answer of GFA Brands, Inc., 4 TTABVUE. The bulk of Applicant's listed defenses are not true affirmative defenses but allege Opposers' lack of standing, the insufficiency of their pleadings, or constitute amplifications of Applicant's denials of the allegations of likelihood of confusion and likelihood of dilution. *See* Trademark Rule 2.106(b)(1), 37 C.F.R. § 2.106(b)(1).

## III. Evidence of record.

The record consists of the pleadings, and by operation of Trademark Rule 2.122(b), 37 C.F.R. § 2.122(b), the involved application files. In addition, the parties introduced the following testimony and evidence:[12]

### A. Opposers' testimony and evidence.

    1.    Opposers' Notices of Reliance upon the following evidence:

        a.    Applicant's responses to Opposers' first set of interrogatories and requests for admission.[13]

        b.    Select pages from the website *www.eatyourbest.com*, as of March 11, 2013.[14]

        c.    Discovery deposition of expert Dr. Leon B. Kaplan, President and CEO of Princeton Research & Consulting Center, Inc., a survey research firm, taken on April 24, 2012 ("Kaplan I").[15]

---

[12] The parties each submitted testimony and/or exhibits that contained information designated confidential. With respect to each such submission, we have indicated where the confidential version is docketed and where the redacted, publicly available version is docketed. Unless otherwise noted, any references to testimony or exhibits are to the publicly available version.

[13] 51 TTABVUE.

[14] 52 TTABVUE.

[15] 54 TTABVUE. Opposers' notice of reliance is improper as Dr. Kaplan is not an officer, director or managing agent of Applicant, nor is he a corporate designee pursuant to Fed. R. Civ. P. 30(b)(6). *See* Trademark Rule 2.120(j), 37 C.F.R. § 2.120(j). We note, however, Applicant's failure to object and the fact that the substance of the discovery deposition does not conflict with the substance of the same witness's testimony deposition, and so does not affect our consideration of the outcome. Accordingly, we treat the notice of reliance as stipulated into the record by the parties. *See Spoons Rests. Inc. v. Morrison Inc.*, 23

> d. Discovery deposition of expert Philip Johnson, Chief Executive Officer of Leo B. Shapiro & Associates, a marketing research firm, taken on December 18, 2012 ("Johnson I").[16]

2. Testimony deposition of Eric Michael Gray, Associate Director of the Smart Ones brand for Heinz North America, taken on February 20, 2013.[17]

3. Testimony deposition of Sabrina J. Hudson, Associate Director and General Counsel of Heinz, taken on February 20, 2013.[18]

4. Testimony deposition of expert Dr. Barry A. Sabol, President of Strategic Consumer Research, Inc., a market research company, and accompanying exhibits.[19]

---

USPQ2d 1735, 1737 n.11 (TTAB 1990) (no objection to applicant's introduction of discovery deposition of officer of opposer's parent corporation by notice of reliance and thus Board deemed the parties to have stipulated the deposition into the record), *aff'd mem.*, 972 F.2d 1353 (Fed. Cir. 1992).

[16] 53 TTABVUE. We will treat the notice of reliance on Mr. Johnson's expert discovery deposition in the same fashion as the notice of reliance on Dr. Kaplan's expert discovery deposition, for the same reasons. *See supra* note 15.

[17] The confidential version of the Gray deposition is docketed at 55 TTABVUE; the publicly-available version is docketed at 56 TTABVUE.

[18] The confidential version of the Hudson deposition is docketed at 57 TTABVUE; the publicly-available version is docketed at 58 TTABVUE.

[19] The confidential version of the Sabol deposition is docketed at 59 TTABVUE; the publicly-available version is docketed at 60 TTABVUE.

**B.     Applicant's testimony and evidence.**

1.     Applicant's Notices of Reliance upon the following evidence:

a.     Printouts from the electronic database records of the USPTO showing the current status and title of seven registrations owned by Applicant for the mark SMART BALANCE, in typed or standard character format, for a variety of goods in International Classes 29 and 30.[20]

b.     Printouts from the electronic database records of the USPTO showing the current status and title of fourteen third-party registrations for marks incorporating the word "SMART" for goods in International Classes 5, 29, 30, 31, and 32.[21]

c.     Pages from websites indicating third-party use of the word "SMART" in conjunction with the marketing of food and other health-related goods and diet and health-related cookbooks.[22]

---

[20] 66 TTABVUE.

[21] 61, 62, and 63 TTABVUE.

[22] 63, 64, 65, and 66 TTABVUE.

d. Original product packaging (and photographs of the same) for various third-party food items showing use of the word "SMART."[23]

e. Discovery deposition of Marian Joan Findlay, Senior Marketing Manager for Heinz, and accompanying exhibits.[24]

2. Testimony deposition of Timothy Kraft, Vice-President and Associate General Counsel for GFA Brands, Inc., and accompanying exhibits.[25]

3. Testimony deposition of William E. Hooper, Director of GFA Brands, Inc. and senior advisor to the marketing groups of GFA Brands, Inc. [26]

---

[23] 66, 68, and 81 TTABVUE.

[24] The entire discovery deposition of Marion Joan Findlay and accompanying exhibits were designated as "Confidential," and that material is docketed at 67 and 69-80 TTABVUE but currently unavailable for public viewing. Board proceedings are open to the public and, as a result, only truly confidential information should be designated as such. While we observe such designations as a general rule, we will not do so where they plainly do not apply and where to do so would hamper our analysis of the proceeding. In view thereof, **Opposers are allowed 30 days from the mailing date of this decision to refile the Findlay deposition transcript separating the confidential testimony from the nonconfidential testimony pursuant to the instructions in TBMP § 120.02, failing which the above-noted transcript will be made available to the public.**

[25] Confidential Exhibit # 76 to the Kraft deposition is docketed at 90 TTABVUE; the publicly-available version is docketed at 85 TTABVUE.

[26] The confidential version of the Hooper deposition is docketed at 88 TTABVUE; the publicly-available version is docketed at 89 TTABVUE.

4. Testimony deposition of William Shanks, Private Investigator for Marksmen, Inc., and accompanying exhibits.[27]

5. Testimony deposition of expert Dr. Leon B. Kaplan, identified above, and accompanying exhibits ("Kaplan II").[28]

6. Testimony deposition of expert Philip Johnson, identified above, and accompanying exhibits ("Johnson II").[29]

## IV. Evidentiary Issues.

Both parties filed objections to evidence centered on expert witness disclosures and surveys. Specifically, Opposers submitted a likelihood of confusion survey conducted by Dr. Barry A. Sabol, and Applicant responded with a critique of the Sabol survey prepared by Dr. Leon Kaplan and a likelihood of confusion survey of its own, conducted by Mr. Philip Johnson. Each survey was criticized in testimony by the expert who had conducted the opposing survey, and the Johnson survey was bolstered in Dr. Kaplan's testimony. As discussed below, Opposers object to Mr. Johnson's survey and to the entirety of his testimony and to Dr. Kaplan's bolstering testimony.[30] Applicant registers an objection to Dr. Sabol's critique of the Johnson survey, conditioned upon the Board's handling of Opposers' evidentiary objections.[31]

---

[27] 84 TTABVUE.

[28] 86 TTABVUE.
[29] 87 TTABVUE.

[30] Opposers' Reply Brief at A3-A7, 96 TTABVUE 30-34. Opposers affirmatively state that they have no evidentiary objection to Dr. Kaplan's critical opinions regarding the Sabol survey as reflected in his expert report. Opposers' Reply Brief at A3, n.1, 96 TTABVUE 30.

[31] Applicant's Trial Brief at A2, A8-A13, 92 TTABVUE 60, 66-72.

### A.    The Johnson survey.

Opposers urge the following two arguments in support of striking the Johnson survey. First, Opposers argue that Applicant's disclosure of Mr. Johnson's survey and his related expert opinions was untimely because it did not comply with Trademark Rule 2.120(a)(2), 37 C.F.R. § 2.120(a)(2), which provides that "[d]isclosure of expert testimony must occur in the manner and sequence provided in Federal Rule of Civil Procedure 26(a)(2) unless alternate directions have been provided by the Board . . . ." Rule 26(a)(2)(D)(ii) requires disclosure of rebuttal expert testimony within 30 days of another party's initial expert disclosure. After Opposers made an initial disclosure of Dr. Sabol's expert report, Applicant asserted the need to obtain an expert to rebut the report. Applicant obtained one consented-to extension of time for that purpose but was refused a second extension of time by Opposers and subsequently sought relief from the Board. The Board granted Applicant's motion for an extension of time and reset the date for expert disclosures for May 1, 2012.[32] Although Applicant submitted Mr. Johnson's report on April 28, 2012, the report did not purport to describe the results of a survey patterned after the Sabol survey but described the results of an independent survey. As a consequence, Opposers assert, the Johnson survey exceeds the bounds of rebuttal

---

[32] Board Order dated March 16, 2012, 29 TTABVUE. Subsequent to Applicant's expert disclosures, Opposers moved to strike the Johnson report as untimely for the reasons detailed above. The Board denied the motion, construing it as a motion in limine which the Board does not hear and noting that Opposers should raise any objections relating to improper rebuttal in their brief in the case. Board Order dated June 21, 2012, 35 TTABVUE. *See Byer Cal. v. Clothing for Modern Times Ltd.*, 95 USPQ2d 1175, 1178 (TTAB 2010); *Greenhouse Sys. Inc. v. Carson*, 37 USPQ2d 1748, 1750 (TTAB 1995).

evidence and should have been disclosed before the time elapsed for initial, as opposed to rebuttal, expert disclosures.[33] Second, Opposers argue that to the extent that the Board considers the Johnson survey, it should afford it the same evidentiary weight that it affords the Sabol survey. Specifically, if the Board finds the Sabol survey too flawed to consider, then there is nothing to rebut so the Board should disregard the Johnson survey as well.[34]

Opposers' arguments confuse the dual meanings of "rebuttal." Rebuttal may refer to the type of evidence at issue, specifically evidence intended to contradict an adverse party's evidence, or it may refer to the procedural phase of a trial, specifically the time accorded a party to respond to an adverse party's evidence.[35] Mr. Johnson testified that he was retained by Applicant to conduct a survey to rebut the Sabol survey:

> Q. And when we sent you Exhibit 1, the Sabol survey, what did we ask you to do in response to it?
>
> A. You asked me if I could design and conduct a survey that would essentially be in rebuttal to the survey that was offered here.
>
> Q. What is the typical rebuttal survey like?
>
> A. Well, typically in a rebuttal survey what you do is you take the survey that was offered, usually by the other side, and you change one or two elements in the survey that we'll call fatal flaws, and then re – redo that survey pretty much how the original person who designed it did it, except for those changes.

---

[33] Opposers' Reply Brief at A3-A5, 96 TTABVUE 30-32.

[34] *Id.* at p. 16.

[35] See the definition of "rebuttal" in Black's Law Dictionary (10th ed. 2014).

Q.    Did you do that typical type of rebuttal survey here?

A.    No, I did not.

Q.    Why not?

A.    Because the survey was so flawed it was impossible to work with as a template for doing a proper survey. [36]

In order to properly respond to the Sabol survey, Mr. Johnson testified that he needed to construct an independent survey to test for likelihood of confusion.[37]

Opposers emphasize that Mr. Johnson's expert report does not explicitly describe his survey as a rebuttal survey nor does it mention Dr. Sabol or his survey at all. Mr. Johnson's report simply states:

> Counsel asked whether I could design and conduct a study that would measure the extent, if any, to which the Smart Balance name that has been objected to by ProMark is or is not likely to cause confusion when relevant consumers are exposed to it in connection with frozen meal products.[38]

Opposers argue that the quoted language from Mr. Johnson's report conflicts with his testimony and, in conjunction with his failure to use the Sabol survey as a template, undermines Applicant's position that the Johnson survey is a rebuttal survey, as a result of which its disclosure was untimely.[39]

We see no reason why the Johnson survey cannot stand in rebuttal to the Sabol survey despite the fact that it did not use the latter as a template and despite Mr.

---

[36] Johnson II, pp. 4-5, 87 TTABVUE 8-9.

[37] *Id.* at pp. 13-14.

[38] *Id.* at Ex. 2, ¶5.

[39] Opposers' Reply Brief at A3-A5, 96 TTABVUE 30-32.

Johnson's failure to reference the Sabol survey in his report. Rule 26(a)(2)(D)(ii) refers to a rebuttal expert witness as one who presents "evidence intended solely to *contradict* or rebut evidence on the same subject matter identified by another party under Rule 26(a)(2)(B) or (C). . . ." (Emphasis added.) Applicant disclosed Mr. Johnson's survey report within the time frame set by the Board and the opinions set forth in his report certainly contradict the conclusion regarding likelihood of confusion reported by Dr. Sabol. In that vein, there is no conflict between what Mr. Johnson's report indicates he was retained to do—construct a study to measure the extent, if any, of likelihood of confusion—and the rebutting nature of the study itself. We find that the disclosure of the Johnson survey report within the time allowed by Fed. R. Civ. P. 26(a)(2)(D)(ii), as extended, was timely.

Opposers argue that, if the Johnson survey is admitted into evidence, its evidentiary force should be confined to neutralizing the Sabol survey. Applicant's only burden of proof in this proceeding is to counter evidence supporting Opposers' claims and Applicant's only opportunity to submit such evidence is during its case-in-chief. *See Osage Oil & Transp. Co. v. Standard Oil Co.*, 226 USPQ 905, 907 n.10 (TTAB 1985) (noting that TTAB rules of practice make no provision for a rebuttal testimony period for the party defendant).

The case law relied upon by Opposers in support of their argument does not address evidence offered during an applicant's case-in-chief but relates to the admissibility of an opposer's survey evidence submitted during the rebuttal testimony period. In *Bridgestone Firestone N. Am. Tire, LLC v. Fed. Corp.*, 2010 WL

985350 (TTAB 2012), *rev'd* 673 F.3d 1330, 102 USPQ2d 1061 (Fed. Cir. 2012), the Board overruled an applicant's objection to a survey submitted during an opposers' rebuttal testimony period which was designed to address criticisms directed to an earlier survey submitted during the main testimony period. The Board considered the second survey to the extent that it bore on the validity and probative value of the first survey but declined to consider it more generally in support of opposer's case-in-chief. *Id.* at *2. The Federal Circuit reversed the Board's finding of no likelihood of confusion without addressing the survey evidence. Similarly, in *Hard Rock Café Int'l (USA) Inc. v. Elsea*, 56 USPQ2d 1504 (TTAB 2000), the Board sustained an objection to an opposer's survey submitted during the rebuttal testimony period that was directed to proving an element of opposer's case-in-chief. *Id.* at 1509. Applicant is not limited to using the Johnson survey to directly comment on Dr. Sabol's opinions but may use the Johnson survey to counter Opposers' admissible evidence, whatever its form, offered to prove that likelihood of confusion exists. *See* Trademark Rule 2.121(b), 37 C.F.R. § 2.121(b) (referring to applicant's testimony period as an opportunity "for the defendant to present its case and to meet the case of the plaintiff.").

### B. Mr. Johnson's critique of the Sabol survey.

In addition to Opposers' objection to the Johnson survey, Opposers also object to the testimony of Mr. Johnson directly criticizing the Sabol survey. Although Applicant failed to disclose its intended reliance on Mr. Johnson's critique in accordance with Rule 26(a)(2), his opinions in this regard were disclosed during the

discovery period. At the beginning of his discovery deposition, Opposers' counsel asked him what aspects of Dr. Sabol's survey he felt were flawed, and Mr. Johnson responded: "The universe that he included in the survey, the questions that he asked, the analysis he did, and the conclusions he reached."[40] Although his response was general, the remainder of his discovery deposition was directed to those same aspects of his own survey which differed point by point from the design and methodology of the Sabol survey. Implicit in that testimony is a detailed critique of the Sabol survey. Applicant elicited testimony, during the later testimonial deposition of Mr. Johnson, in which Mr. Johnson explicitly criticized the Sabol survey.[41]

In order to consider Mr. Johnson's critique of the Sabol survey, the Board must find Applicant's failure to make a specific disclosure to be harmless or justified. *See* Fed. R. Civ. P. 37(c), made applicable to Board proceedings by Trademark Rule 2.116(a). *See, e.g.*, *Gen. Council of the Assemblies of God dba Gospel Publ'g House v. Heritage Music Found.*, 97 USPQ2d 1890, 1892 (TTAB 2011). In making that determination, the Board applies the following five-factor test:

> 1) the surprise to the party against whom the evidence would be offered; 2) the ability of that party to cure the surprise; 3) the extent to which allowing the testimony would disrupt the trial; 4) importance of the evidence; and 5) the nondisclosing party's explanation for its failure to disclose the evidence.

*Great Seats Inc. v. Great Seats Ltd.*, 100 USPQ2d 1323, 1327 (TTAB 2011) (citing *Southern States Rack & Fixture, Inc. v. Sherwin-Williams Co.,* 318

---

[40] Johnson I, p. 11, 53 TTABVUE 16.

[41] Johnson II, pp. 15-60, 87 TTABVUE 19-64.

F.3d 592, 597 (4th Cir. 2003)). *See also MicroStrategy, Inc. v. Bus. Objects, S.A.,* 429 F.3d 1344, 77 USPQ2d 1001, 1009-10 (Fed. Cir. 2005) (applying *Southern States* factors in excluding non-expert damages evidence as a sanction for late disclosure).

Opposers cannot claim surprise or prejudice to their case as a result of Applicant's failure to make an explicit disclosure under Rule 26(a)(2) given the broad criticisms Mr. Johnson leveled at the Sabol survey during his discovery deposition. This certainly alerted Opposers to Mr. Johnson's general views concerning the Sabol survey, at which point Opposers were free to inquire further into the specifics of what led Mr. Johnson to his view. Moreover, Mr. Johnson's criticisms of the Sabol survey relate inextricably to testimony regarding his own survey and, so, assists the Board in assessing both while not disrupting or unduly extending the course of the proceeding.  The purpose of the expert disclosure rules is to facilitate the orderly administration of the proceeding, not to provide advantages to one party over another based solely upon procedural deficiencies. *See Gen. Council of Assemblies of God* at 1893. Keeping that purpose in mind and considering the lack of prejudice to Opposers, the lack of disruption to the proceeding, and the importance of the testimony, we view Applicant's failure to specifically disclose an intention to rely on Mr. Johnson's critique of the Sabol survey to be harmless and will consider his testimony in that regard.

## C.     Dr. Kaplan's support of the Johnson survey.

Applicant's failure to disclose Dr. Kaplan's expert opinion testimony bolstering the Johnson survey falls into a different category, however. During Dr. Kaplan's discovery deposition, no mention was made of Mr. Johnson other than Dr. Kaplan's indication that he had not discussed Dr. Sabol's report "with anyone by the name of Philip Johnson."[42] He did, however, offer opinions supporting the Johnson survey later during his testimony deposition.[43] At the close of that deposition, Opposers' counsel asked Dr. Kaplan if he had prepared a supplemental report disclosing any opinions not contained in his original critique of the Sabol survey and he responded that he had not.[44] That interchange and Applicant's failure thereafter to supplement its original expert disclosure to encompass Dr. Kaplan's testimony supporting the Johnson survey made it reasonable for Opposers to believe that the testimony would not be relied upon for purposes of trial. Moreover, even if Applicant had attempted to supplement its original disclosure, Dr. Kaplan's supporting testimony would not have been permissible under Rule 26(e) which allows an expert to supplement by *completing or correcting* prior disclosures but does not permit the expert to bolster previously disclosed opinions or to add new opinions. *See Akeva LLC v. Mizuno Corp.*, 212 F.R.D. 306, 310 (M.D.N.C. 2002) (noting that to construe "supplementation" to include bolstering opinion testimony would disrupt docket control and would "amount to unlimited expert opinion preparation"). Accordingly,

---

[42] Kaplan I, p. 108, 54 TTABVUE 114.

[43] Kaplan II, pp. 35-37, 45-46, 56-57, 74, 86 TTABVUE 40-42, 50-51, 61-62, 79.

[44] *Id.* at p. 128.

we decline to consider that portion of Dr. Kaplan's expert opinion testimony directed to support of the Johnson survey.

### D. Dr. Sabol's critique of the Johnson survey.

Finally, Applicant raises a conditional objection to Opposers' use of Dr. Sabol's criticism of the Johnson survey. In short, Applicant suggests that if the Board declines to consider Dr. Kaplan's validation of the Johnson survey and Mr. Johnson's critique of the Sabol survey, for failure to make expert disclosures in accordance with Fed. R. Civ. P. 26(a)(2), then the Board should correspondingly refuse to consider Dr. Sabol's critique of the Johnson survey. Applicant served Mr. Johnson's report on Opposers only days before the end of the discovery period. Nevertheless, Dr. Sabol's opinions with regard to that report are rebuttal as envisioned by Rule 26(a)(2)(D)(ii) and should have been disclosed in the ensuing 30 days. Despite the fact that Opposers did not properly make this disclosure, our assessment of both surveys is assisted by considering each side's expert's critique of the other's work and Opposers' intent to introduce those opinions can hardly have surprised Applicant given its similar intent and conduct. We find Opposers' failure to disclose Dr. Sabol's rebuttal testimony to be harmless.

## V. Standing and priority.

Opposers submitted the pleaded registrations through the testimony deposition of Heinz's Associate Director and Corporate Counsel, who identified copies of each registration certificate and a printout from the electronic database records of the USPTO showing the current status and Heinz's present ownership of each

registration as a result of the recent assignments from ProMark. The identified documents were made exhibits to the deposition.[45] Because Opposers have properly made the pleaded registrations of record, Opposers have established their standing. *See Citigroup Inc. v. Capital City Bank Group Inc.*, 94 USPQ2d 1645, 1654 (TTAB 2010), *aff'd*, 637 F.3d 1344, 98 USPQ2d 1253 (Fed. Cir. 2011). Further, Applicant has not counterclaimed for cancellation of any of the registrations in this proceeding so priority is not in issue with respect to the mark and goods identified in those registrations. *King Candy Co. v. Eunice King's Kitchen*, 496 F.2d 1400, 182 USPQ 108, 110 (CCPA 1974).

## VI.    Likelihood of confusion

Our determination under Section 2(d) is based on an analysis of all of the probative facts in evidence that are relevant to the factors bearing on the issue of likelihood of confusion, as set forth in *In re E. I. du Pont de Nemours & Co.*, 476 F.2d 1357, 177 USPQ 563, 567 (CCPA 1973). *See, e.g., Bose Corp. v. QSC Audio Prods. Inc.*, 293 F.3d 1367, 63 USPQ2d 1303, 1305 (Fed. Cir. 2002). While we have considered each factor for which we have evidence, we focus our analysis on those factors we find to be relevant. *See Han Beauty, Inc. v. Alberto-Culver Co.*, 263 F.3d 1333, 57 USPQ2d 1557, 1559-1560 (Fed. Cir. 2001). In this case, our analysis centers on the relatedness of the goods and the channels of trade, the consumers of the parties' products and their degree of care in making the purchasing decision, similarity between the marks, fame of Opposers' mark, and survey results directed

---

[45] Hudson, pp. 19-27 and Exs. 2-6, 58 TTABVUE 25-33 and 116-135.

to a likelihood of confusion. As detailed below, we conclude that likelihood of confusion has not been established.

### A. Relatedness of the parties' goods and trade channels.

In opposition proceedings in which the opposer has pleaded a registration, the relatedness of the parties' goods is analyzed by reference to the express wording of the involved application and registration. *Octocom Sys. Inc. v. Houston Computers Svcs. Inc.*, 918 F.2d 937, 16 USPQ2d 1783, 1787 (Fed. Cir. 1990); *In re Elbaum*, 211 USPQ 639, 640 (TTAB 1981) (*citing Kalart Co., Inc. v. Camera-Mart, Inc.*, 119 USPQ 139 (CCPA 1958)). Using that reference, we note that both Applicant and Opposers identify frozen cakes and frozen entrees, although the primary ingredients of such entrees differ, with Applicant identifying pasta or rice and Opposers reciting chicken, fish, or vegetables.[46] Additionally, Applicant's "frozen appetizers" are encompassed within Opposers' "frozen bread or wrap having a meat and/or vegetable filling," which, not being limited to sandwiches or entrees, may be a type of appetizer. The parties' goods, as described in the involved applications and registrations, are closely related and, in several cases, legally identical, a matter which Applicant does not contest.

Prior to this proceeding, Opposers' and Applicant's respective marks enjoyed a seventeen-year history of peaceful co-existence in the U.S. marketplace.[47] The

---

[46] Despite the difference in primary ingredients, Opposers' principal source of concern appears to be Applicant's intent to market frozen entrees under the SMART BALANCE mark. *See* Hudson, pp. 12-15, 58 TTABVUE 18-21.

[47] Opposers' Trial Brief, p. 17, 82 TTABVUE 25 ("To date, there have not been any product categories in which the SMART BALANCE and SMART ONES products overlap.");

SMART ONES brand was introduced in 1992 and is now one of Opposers' most valuable brands, used for a wide range of frozen food products.[48] Applicant's SMART BALANCE brand was first applied to heart-healthy butter substitutes in 1996[49] and, since that time, Applicant has expanded its use of the mark to such items as "buttery spreads and buttery substitutes, milk, popcorn, peanut butter, mayo, eggs, and sour cream."[50] The parties' respective products have been sold through the same grocery store chains, the same mass merchants such as Wal-Mart and Target, and the same club stores such as Costco and Sam's Club,[51] and their products have been advertised through the same forms of mass media, even appearing in some of the same retailer promotional circulars.[52] Until events detailed in the record, however, the SMART ONES and SMART BALANCE products did not threaten to appear side by side in the frozen food case. Applicant offers no evidence that it intends to utilize different channels of trade for the items recited in its application, and indeed Applicant seems to concede that it will rely

Applicant's Trial Brief, pp. 29-30, 92 TTABVUE 37-38 ("In about seventeen years of co-existence there have been no reported instances of actual confusion.").

[48] Hudson, pp. 9, 11, and 12, 58 TTABVUE 15, 17, and 18.

[49] Hooper, p. 11-15 and Ex. 2, 89 TTABVUE 15-19 and 128; Kraft, p. 5-6, 85 TTABVUE 9-10.

[50] Opposers' Trial Brief, p. 16, 82 TTABVUE 24 (citing Kraft, p. 6, Hooper, p. 10, and Gray, p. 26).

[51] Gray, pp. 28-29 and 74-75, 56 TTABVUE 33-34 and 50-51; Hooper, pp. 21-22, 24-25, and 52-55, 89 TTABVUE 25-26, 28-29, and 56-59.

[52] Gray, pp. 50-51, 56 TTABVUE at 42-43; Hooper, pp. 26-27, 89 TTABVUE 30-31.

upon the channels of trade it has used to date.[53] The identity of established, likely-to-continue trade channels and the lack of restriction on trade channels in the involved applications and Opposers' registrations give rise to an evidentiary presumption that the parties' in part legally identical goods would appear in many of the same frozen food sections of the same stores. *See Stone Lion Partners, LP v. Lion Capital LLP*, 746 F.3d 1317, 110 USPQ2d 1157, 1162 (Fed. Cir. 2014). *See also In re Viterra Inc.*, 671 F.3d 1358, 101 USPQ2d 1905, 1908 (Fed. Cir. 2012).

In summary, the parties' goods, as identified, are in part legally identical, and in part closely related. The channels of trade for these goods have been shown to be the same. These factors favor a conclusion of likelihood of confusion.

### B. Purchasing care.

Because the goods are in part legally identical, we must presume that they are sold to the same classes of customers. *See, e.g.*, *In re Yawata Iron & Steel Co.*, 403 F.2d 752, 159 USPQ 721, 723 (CCPA 1968). The parties disagree as to whether these consumers could be expected to exercise any significant degree of care in making the purchasing decision. Opposers focus on the low cost of frozen nutritional entrees—between $2.00 to $4.00 per item—to support their position that the purchase is attended by relatively little deliberation.[54] Applicant highlights the

---

[53] Applicant's Trial Brief, pp. 26-27, 92 TTABVUE 34-35 ("That the SMART ONES mark has coexisted with so many products sold in some of the very same stores proves that Heinz's rights are narrowly defined and strongly suggests that expanding the products offered under the SMART BALANCE trademark is not likely to lead to confusion.").

[54] Gray, p. 33, 56 TTABVUE 38. With regard to the frozen nutritional entree category, Heinz's Associate Director of the Smart Ones Brand testified:

health-related aspects of products in the frozen nutritional entree category, however, and argues that such items are selected with considerable care.[55] Because the goods recited in the involved applications and registrations are not confined to food items with low fat or caloric content, we must assume that the relevant class of consumers for the parties' goods is the public at large and not simply health-conscious or dieting consumers. *See In re Bercut-Vandervoort & Co.*, 229 USPQ 763, 765 (TTAB 1986) ("[E]vidence and/or argument relating to . . . expensive, high quality wines sold in high-quality wine and spirits stores to discriminating, sophisticated purchasers who would likely be familiar with the vineyard naming customs in France must be disregarded since there is no restriction in the application or registration limiting the goods to particular channels of trade or classes of customers."). We recognize that ordinary consumers may be expected to consider the nutritional benefits or the ingredients of their food purchases but that care may or may not extend to consideration of the trademark affixed to the

---

Q. In your experience, do the consumers have a particular brand loyalty?

A. Loyalty is [sic] this category is actually fairly low. Consumers tend to pick the flavor that they like.

Q. How would that manifest itself—if I am a frozen nutritional shopper, how would that manifest itself if I were to go to the grocery store?

A. They walk to the section, they are scanning the section for sales, for new items, for the flavors that they like the best, and they grab those and they load up their cart.

*Id.*

[55] Findlay, p. 53, 67 TTABVUE 55. As noted earlier, the entirety of Ms. Findlay's discovery deposition was designated "Confidential." As Heinz's Senior Marketing Manager, Ms. Findlay's opinions on matters related to this proceeding are relevant and not the type of data or business information generally considered confidential. *See supra* note 24.

selection, which is the relevant inquiry in the *du Pont* analysis. We find that the ordinary consumer, whether or not concerned about a healthy lifestyle, would exercise a moderate to low degree of care in purchasing the parties' food products. The identity of consumer classes and their degree of purchasing care weigh slightly in favor of a conclusion of likelihood of confusion.

## C. Similarity of the parties' marks.

We begin by observing that the parties' marks must be compared in their entireties with regard to appearance, sound, connotation and commercial impression. *Palm Bay Imports, Inc. v. Veuve Clicquot Ponsardin Maison Fondee En 1772,* 396 F.3d 1369, 73 USPQ2d 1689, 1692 (Fed. Cir. 2005). Nonetheless, to the extent that the parties' marks contain a common element, it is proper to inquire whether, in considering the marks in their entireties, one element is dominant, that is, whether it is more responsible than other elements for creating the commercial impression communicated by the mark overall. *See In re Nat'l Data Corp.*, 753 F.2d 1056, 224 USPQ 749, 751 (Fed. Cir. 1985)("[T]here is nothing improper in stating that, for rational reasons, more or less weight has been given to a particular feature of a mark, provided the ultimate conclusion rests on consideration of the marks in their entireties."). In this case, the parties' marks share a common lead term—the word "SMART." Applicant argues that the word "SMART" is laudatory and, therefore, descriptive in nature, and Opposers do not contest the laudatory characterization. In fact, Marion Joan Findlay, the Senior Marketing Manager at

Heinz, conceded the laudatory nature of the term in her testimony deposition when asked about the connotation of the mark "SMART ONES" as a whole:

Q. The words themselves in "Smart Ones". "Smart" is obviously a laudatory or complimentary term.

A. Yes.

Q. And as used in Smart Ones, what does it connote or suggest?

A. You have made the right choice. You are on a journey, you are on a path. We can help you.

Q. And the word "Ones, what does that connote in the "Smart Ones"?

A. We believe that it was a – it is a journey that you take. But there is more than one of you taking this journey.

Q. So the "Ones" is referring to essentially the consumer?

A. It refers to the consumer. It also refers to the product as well.

Q. In what way does it refer to the product?

A. The product, in its initial inception, was designed with one gram of fat.

Q. You have gone beyond one gram?

A. Absolutely.

Q. What does it connote now, "Ones"?

A. Exactly that one person that it is you alone can can [sic] make the decisions to follow the right lifestyle, to eat the right foods, to make a change in the way you live your life.

Q. So does "Ones" refer now to the consumer, primarily, as opposed to the product itself?

A. Yes.[56]

---

[56] *Id.* at pp. 68-69.

In support of its position that the word "SMART" is a weak, descriptive term, Applicant submits evidence of multiple third-party registrations and numerous uses of marks comprising or incorporating "SMART" in the consumer packaged goods industry.[57] Opposers counter that there is no evidence of any registration or use of the word with frozen entrees, frozen appetizers, or frozen cakes, and that Heinz actively and consistently polices third-party uses believed to infringe upon its SMART ONES trademark.[58] Nevertheless, the evidence of record establishes that the word "SMART" is commonly used in marketing food items to describe a product that is low in calories, low in fat, soy-based, vegetarian, heart-healthy, nutrient-rich, high in fiber, or otherwise contributes to a healthy lifestyle. Such third-party registrations and uses are competent to show that the common term has an accepted meaning in a given field and that marks containing the term have been registered and used for related goods because the remaining portions of the marks may be sufficient to distinguish the marks as a whole from one another. *See Sports Auth. Michigan Inc. v. PC Auth. Inc.*, 63 USPQ2d 1782, 1798 (TTAB 2002) ("[W]e find the numerous registrations and web site uses probative evidence that marks using a descriptive or suggestive term followed by the term "Authority" are attractive to many businesses, are adopted to convey the very suggestive connotation that the adopting entity is an expert or authority in the particular field in which it is engaged, and that such marks often co-exist and are distinguished

---

[57] See exhibits appended to Applicant's Notices of Reliance, docketed at 63, 64, 65, 66, 68, and 81 TTABVUE.

[58] Hudson, pp. 33-56, 58 TTABVUE 39-62.

because of the other terms used in conjunction with 'Authority.'"); *Am. Hosp. Supply Corp. v. Air Prods. and Chems., Inc.*, 194 USPQ 340, 343-44 (TTAB 1977) ("In the instant case, it is apparent that opposer, applicant, and others in the trade have adopted the term "DISPO" as the mark or as a portion of their marks to convey the suggestion thereof, namely, that their products are of a disposable type. . . . [I]t would appear from the third-party registrations that other parties can register composite marks containing this term for medical and hospital supplies without creating a Section 2(d) conflict with opposer's registered mark.").

The weak trademark significance of the word "SMART" when used on food items deemed to promote a healthy lifestyle contributes less distinctiveness to the overall commercial impression of the parties' respective marks than would an arbitrary or fanciful term. The second word in each of the parties' marks combines with "SMART" to create markedly different visual and phonetic impressions, different connotations, and different overall commercial impressions. "SMART BALANCE" is composed of more syllables than "SMART ONES" and is noticeably different in appearance and sound from Opposers' mark. As explained in Ms. Findlay's testimony, Heinz focuses marketing of the SMART ONES brand to people who want to live a healthy lifestyle.[59] "SMART ONES," although originally connoting a low-fat food item, now connotes the health-conscious consumer on a journey to a healthier lifestyle. On the other hand, William E. Hooper, Director of GFA Brands, Inc. and senior advisor to the marketing groups of GFA Brands, Inc., testified that "SMART

[59] Findlay, pp. 14-15, 67 TTABVUE 16-17.

BALANCE" refers directly to the product and implicitly references not just its health benefits but also its taste: "The Smart Balance trademark is positioned to communicate a – the balance, the appropriate, right balance of great taste and good health, with primary emphasis on heart health."[60] Although both marks are applied to healthy food items, the parties' marketing emphasis differs, implying that the commercial impressions conveyed by the two marks differ as well.

Given their differences visually and phonetically, the weakness of their shared term "SMART," their different connotations, and their overall differing commercial impressions, we find that the parties' marks are sufficiently dissimilar to weigh against a conclusion of likelihood of confusion.

### D. Fame of the plaintiff's mark.

Opposer argues that its mark is famous. Fame of an opposer's mark may be measured indirectly by, among other things, the volume of sales of the goods traveling under the mark, advertising expenditures related to the mark and the goods, and the length of time those indicia of commercial awareness have been evident. *E.g., Nina Ricci, S.A.R.L. v. E.T.F. Enters., Inc.,* 889 F.2d 1070, 12 USPQ2d 1901, 1902 (Fed. Cir. 1989) (NINA RICCI found to be a famous mark for perfume, clothing and accessories: $200 million in sales, over $37 million in advertising over 27 years); *Kimberly–Clark Corp. v. H. Douglas Enters., Ltd.,* 774 F.2d 1144, 227 USPQ 541, 542 (Fed. Cir. 1985) (HUGGIES found to be a famous mark for diapers: over $300 million in sales over 9 years, $15 million in advertising in one year). When the numbers are large, they may suffice to prove fame for likelihood of

---

[60] Hooper, p. 25, 89 TTABVUE 29.

confusion purposes, assuming relevant contextual indicators support that conclusion. *See, e.g., Bose Corp. v. QSC Audio Prods. Inc.*, 293 F.3d 1367, 63 USPQ2d 1303, 1305-06 (Fed. Cir. 2002) ("In this case, the sales and advertising numbers for ACOUSTIC WAVE and WAVE have to be seen both in the context of how the products are presented in the advertising and sales material (here with sufficient independence from the famous house mark) and in the context of the continuous and extensive critical consideration the marked products have enjoyed."). Because we accord a famous mark a broad scope of legal protection and because fame plays a dominant role in the likelihood of confusion analysis, the party asserting that its mark is famous must clearly prove that fact. *Leading Jewelers Guild Inc. v. LJOW Holdings LLC*, 82 USPQ2d 1901, 1904 (TTAB 2007).

Opposers submit several types of evidence to support their assertion that the SMART ONES mark has achieved fame. First, Opposers point to general testimony that the mark has been heavily advertised during its twenty years of existence and has achieved a high volume of sales.[61] Although such evidence is too non-specific to carry significant probative weight, Opposers also submitted confidential sales figures for SMART ONES products for fiscal years 2007 and 2008 as well as confidential promotional and advertising expenditures for fiscal year 2008 related to such products.[62] The principal difficulty presented by these figures, which represent large numbers of dollars, is that the SMART ONES mark always appears in

---

[61] Hudson, pp. 82-84, 58 TTABVUE 88-90.

[62] Gray, pp. 41-48, 62-63, and Ex. 40, 55 TTABVUE 11-18, 25-26, and 39.

conjunction with the WEIGHT WATCHERS trademark.[63] Logically, moneys spent to support the SMART ONES mark promote the WEIGHT WATCHERS mark at the same time, and sales of SMART ONES products are, by definition, sales of WEIGHT WATCHERS SMART ONES products. Consequently, we are unable to attribute either promotional expenditures or resulting sales to the SMART ONES mark as opposed to either the WEIGHT WATCHERS mark alone or to some combination of the two. It is well-settled that, where, as here, a party's advertising and sales data is based on materials and packaging in which the mark at issue is almost always displayed with another mark, such data does not prove that the mark at issue possesses the requisite degree of consumer recognition. *See, e.g., In re Bongrain Int'l (Am.) Corp.*, 894 F.2d 1316, 3 USPQ2d 1727, 1729 (Fed. Cir. 1990) (sales and advertising figures alone may not suffice where other marks were featured with the mark at issue or the growth could be attributed to the product's popularity); *In re Soccer Sport Supply Co.*, 507 F.2d 1400, 184 USPQ 345, 348 (CCPA 1975) (advertising displaying the design at issue along with word marks lacked the "nexus" that would tie together use of the design and the public's perception of the design as an indicator of source); *In re Mogen David Wine Corp.*, 372 F.2d 539, 152 USPQ 593, 595 (CCPA 1967).

We distinguish the present situation from *Bose Corp. v. QSC Audio Prods. Inc.*, 293 F.3d 1367, 63 USPQ2d 1303 (Fed. Cir. 2002). In *Bose*, the Federal Circuit endorsed evidence of advertising and promotional expenses for the ACOUSTIC

---

[63] Findlay, pp. 22 and 97-99, 67 TTABVUE 24 and 99-101.

WAVE music system and the WAVE radio for purposes of proving fame of the marks. The Federal Circuit noted that, although the product marks appeared on the products and the packaging along with the famous BOSE house mark, the evidence of record established independent trademark significance for the two product marks:

> [T]he consumer is presented through the advertising and other promotional material with *frequent* references to the marked product standing alone and apart from the famous house mark. The distinction between uniform coupling of the famous house mark with the product marks and communication to consumers that typically gives significant independent reference to the product apart from the house mark is important, because in the latter instance the consumer has a basis on which to disassociate the product mark from the house mark.

*Id.* at 1307 (emphasis added). The court went on to find the substantial sales and advertising numbers submitted by the Bose Corporation, in conjunction with evidence of commercial and critical success of the products, sufficient to establish fame of the product marks. As explained above, the evidence in this case discloses that the SMART ONES and WEIGHT WATCHERS marks are consistently coupled in the marketplace, which counsels against a finding of fame, based upon advertising and sales figures for Opposers' frozen meals, of the mark SMART ONES alone.

Second, Opposers reference two confidential, independent consumer research studies to support a finding of fame.[64] A study conducted in 2010 by Ipsos ASI for Heinz reported high unaided awareness levels for the SMART ONES brand among

---

[64] Because Opposers take the position that the studies, designated "Confidential," support the claim that the SMART ONES mark has achieved fame, we reference only such detail from the studies as necessary to address that claim.

Opposers' target consumer groups. Examination of the excerpt of the study Opposers submitted does not resolve the uncertainty as to fame of the SMART ONES mark alone. The study's questions, which were directed to brands of *reduced calorie meals*,[65] coupled with the fact that one of the 3 target groups studied was identified as "Weight Watcher members,"[66] raises the question of whether respondents mentioned WEIGHT WATCHERS SMART ONES meals. If such mentions were made and were counted as mentions of SMART ONES meals, the uncertainty as to the fame of "SMART ONES" alone persists.[67] The evidence of record does not elaborate on the study's methodology with sufficient detail to address this concern.

An additional independent consumer survey, conducted on behalf of the Applicant and cited by Opposers in support of their claim that "SMART ONES" has achieved fame, reinforces the uncertainty referenced above by presenting respondents with a list of 10 brands of frozen meals, including "WEIGHT

---

[65] The following questions were asked in the Ipsos ASI study to determine unaided awareness:

> SB1. Thinking about brands of reduced calorie meals, which brand comes to mind first?

> SB2. Which other brands of reduced calorie meals are you aware of?

Gray, Ex. 47, p. 2, 55 TTABVUE 45.

[66] *See id.* at p. 65-66 and Ex. 46, p.2.

[67] We note additional confidential consumer research, apparently generated for Opposers in the 2007-08 timeframe, which emphasizes the importance of partnering the SMART ONES and WEIGHT WATCHERS marks for purposes of increasing brand awareness of the former. *See* Findlay, Ex. 1, pp. 8 and 30, 69 TTABVUE 8 and 30.

WATCHERS SMART ONES," and asking them to indicate which brands they had purchased in the past year.[68] Responses from this study carry no evidentiary weight regarding the fame of "SMART ONES" due to the express partnering of the two marks in the list presented to consumers. *See Carefirst of Maryland, Inc. v. FirstHealth of the Carolinas Inc.*, 77 USPQ2d 1492, 1506-07 (TTAB 2005) (finding that brand awareness studies did little to assist opposer in proving fame of the CAREFIRST mark due, in part, to its consistent partnering with the well-known BLUE CROSS BLUE SHIELD mark), *appeal dismissed*, 171 F. App'x 838 (Fed. Cir. 2006). At best, the consumer research evidence is inconclusive on the question of fame of the SMART ONES mark alone.

Finally, Opposers point to Dr. Sabol's survey which reported an 82% aided awareness level for the SMART ONES mark among individuals who had purchased a frozen meal from the frozen food section of a supermarket in the previous 30 days.[69] Dr. Sabol measured aided awareness by prompting potential survey respondents with a list of 6 trademarks for frozen meals, including "SMART ONES," and asking them which products they had heard of previously.[70] Dr. Sabol also used this inquiry to screen individuals from the pool of survey respondents, a selection method discussed in the next section. Opposers cite the 82% result as corroborating other evidence of fame of the mark. In general, the Board has

---

[68] Hooper, Ex. 51, pp. 3 and 19, 88 TTABVUE 205 and 222.

[69] Sabol, Ex. 1, p. 7, 60 TTABVUE 111.

[70] *Id.* at Ex. 1, p. 17.

discouraged heavy reliance on aided awareness to prove fame*, see*, *e.g., Carefirst of Maryland,* 77 USPQ2d at 1507 (declining to find a mark to be well-known and famous based upon aided awareness results from brand image studies). Because Dr. Sabol's question recited the SMART ONES mark among the 6 suggested responses, we find the results of Dr. Sabol's aided awareness question to lack significant evidentiary value on the question of fame.

While the evidence of record points to some commercial strength attached to the SMART ONES mark, the evidence falls short of "clear proof" of fame of the mark and, therefore, we find that this factor is neutral and does not support a conclusion of likelihood of confusion.

### E.    Survey evidence.

Survey results may act as circumstantial evidence of likelihood of confusion, if the survey is designed and conducted using generally-accepted principles and methodology.[71] As often happens, the parties' respective likelihood of confusion surveys reported results that conflict with one another. The Sabol survey, a telephone survey conducted by trained interviewers, calculated likelihood of confusion at 32% among the 250 respondents surveyed. The Johnson survey, a mall-intercept survey conducted by trained interviewers with 410 respondents, discerned 2%, or de minimis, likelihood of confusion among relevant purchasers. Both surveys were confined to frozen meals and did not address likelihood of confusion with respect to either frozen appetizers or frozen desserts.

---

[71] 6 J. THOMAS MCCARTHY, MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 32:184 (4th ed. 2014) ("McCarthy").

We accept that both parties' experts qualify as experts in the conduct and assessment of likelihood of confusion surveys despite an objection from Applicant regarding Dr. Sabol's minimal litigation experience.[72] According to Dr. Sabol, 95% of the surveys he has conducted have been for business, not litigation, purposes.[73] Surveys conducted for use in litigation typically require certain measures not applicable in the business context, as for example, a requirement that the survey be validated by verifying that 100% of the indicated respondents did indeed participate in the survey.[74] Nonetheless, all that Opposers need to show is that Dr. Sabol possesses sufficient "knowledge, skill, experience, training, or education" to "assist" the trier of fact. Fed. R. Evid. 702. We find that Dr. Sabol's advanced degrees in psychology, his 35 years of experience in conducting consumer market research, and his specific experience over that period of time in creating custom-designed brand awareness and likelihood of confusion studies, qualify him as an expert for purposes of this proceeding.[75]

---

[72] Opposers raise no objection to the expert qualifications of Dr. Kaplan or Mr. Johnson, and the evidence of record leaves no doubt that each possesses the education, training and extensive experience necessary to qualify him as an expert in the conduct and assessment of likelihood of confusion surveys. *See* Kaplan II, pp. 7-17, 86 TTABVUE 12-22; Johnson II, pp. 6-13, 87 TTABVUE 10-17.

[73] Sabol, p. 10, 60 TTABVUE 14.

[74] See Roderick J. Enns, *Use of Surveys and Survey Experts in Trademark Litigation: Strategy and Tactics for the Litigator*, American Bar Association Section of Intellectual Property Law (2001), available at http://ennsandarcher.com/surveys.html.

[75] *See* Sabol, pp. 5-10, 60 TTABVUE 9-14.

Due to the significant disparity between the results of the Sabol and Johnson surveys and the objections raised by each party as to the other's survey, we briefly discuss each survey and we do so with the following best practices in mind:

1. the universe was properly defined and chosen;

2. the survey questions were properly formulated and presented;

3. the interviews were conducted in a manner to minimize error and bias;

4. the data were properly coded, collected, and later analyzed; and

5. the survey reports are complete and appropriately detailed.[76]

Dr. Kaplan and Mr. Johnson level numerous criticisms at the Sabol survey but their primary objections are that Dr. Sabol utilized an under-representative survey population, asked leading, closed-ended questions, omitted a survey control group, and did not report independent validation of survey participation. Dr. Sabol objects to the instructions given to respondents in the Johnson survey and to the survey's reliance on respondents' memory.

Dr. Sabol queried potential survey respondents to determine if they had ever heard of SMART ONES frozen meals and screened them out of the survey population if they indicated unfamiliarity with Opposers' trademarked products. Applicant objects to the screening question as creating an under-inclusive survey universe because, in a traditional likelihood of confusion case, "the proper universe

---

[76] *See, e.g.,* McCarthy at §§ 32:158-32:196; Shari Seidman Diamond, *Reference Guide on Survey Research*, REFERENCE MANUAL ON SCIENTIFIC EVIDENCE 229 (2d ed. Fed. Jud. Ctr. 2000), *available at* www.fjc.gov/public/pdf.nsf/lookup/sciman04.pdf ("Diamond").

to survey is composed of the potential buyers of the *junior user's* goods or services, not the senior user's customers."[77] Dr. Sabol's screening question excluded potential purchasers of SMART BALANCE frozen meals who were unaware of SMART ONES products. Dr. Sabol justified his approach as follows: "The primary reason is that if somebody has no awareness of SMART ONES whatsoever, they have no possibility of being confused between the two brands."[78] In effect, Dr. Sabol skewed the results of his survey by preventing those individuals least likely to be confused from participating. *See, e.g., Paco Sport, Ltd. v. Paco Rabanne Parfums*, 86 F.Supp.2d 305, 54 USPQ2d 1205, 1221 n. 17 (S.D.N.Y. 2000), *aff'd mem.*, 234 F.3d 1262 (2d Cir. 2000) ("The Court finds Paco Rabanne's approach, limiting its [survey] universe to consumers aware of its products, inappropriate because even a weak brand could demonstrate a high degree of confusion because of the limited nature of the universe being surveyed.").

With regard to Dr. Sabol's survey format and the questions asked, we focus on Question No. 3, the pivotal likelihood of confusion question:

> If you were to see a brand of frozen meals in the frozen food section of a supermarket named Smart Balance, would you think it was associated with, licensed by, owned by or in any way connected to Smart Ones? You may answer yes, no, or don't know.[79]

---

[77] McCarthy at § 32:161.

[78] Sabol, p. 20, 60 TTABVUE 24.

[79] *Id.* at Ex. 1, p. 17.

This type of question is associated with the Squirt format, a survey format that measures aided awareness by exposing the respondent to the two marks in issue. *See Squirtco v. Seven-Up Co.*, 628 F.2d 1086, 1089 n.4 and 1091 (8th Cir. 1980). The question is considered "closed-ended" because it suggests a relationship that may never have occurred to the respondent prior to the survey,[80] and it is not followed by the open-ended question "Why?" which would reveal whether the response is related to likely confusion or some other cause.[81] When using a closed-ended question format, a robust control group becomes essential because an appropriate control group ensures that "noise" in the survey is filtered out of the survey results.[82] Noise may reflect a respondent's pre-existing views, ready agreement with any assertion made in a survey question, or just sheer guesswork.[83] Although not all closed-ended questions are also leading questions, we find the closed-ended question quoted above to be leading because it spotlights only two stimuli, i.e., the "SMART ONES" and "SMART BALANCE" trademarks, and provides no other options.[84] In light of his use of leading and closed-end questions, Dr. Sabol's failure to control for noise seriously undermines the results of his survey. Finally, Dr. Sabol did not mention

---

[80] McCarthy at § 32:172.

[81] McCarthy at § 32:175; Diamond at pp. 256-57.

[82] See Jerre B. Swann, *Likelihood of Confusion Studies and the Straitened Scope of Squirt*, 98 TRADEMARK REP. 739, 751-52, 756 (2008).

[83] McCarthy at § 32:187.

[84] *See, generally* Jacob Jacoby, *Are Closed-Ended Questions Leading Questions?, Likelihood of Confusion, in Trademark and Deceptive Advertising Surveys*, TRADEMARK AND DECEPTIVE ADVERSTISING SURVEYS, pp. 261–284 (ABA 2012).

validation of survey participation in his expert report, and it was not until his later testimony deposition that he stated he had validated participation but with his own survey supervisors.[85] The omission in Dr. Sabol's report and the failure to independently validate render his results dubious in a litigation setting.[86] *See*, *e.g.*, *Sheller-Globe Corp. v. Scott Paper Co.*, 204 USPQ 329, 334 (TTAB 1979) (declining to accord any weight to mail survey citing, among other flaws, the failure to check validity of responses).

Apart from the evidentiary objections previously discussed regarding its purportedly non-rebuttal nature and consequent untimeliness, Opposers do not challenge the format or methodology of the Johnson survey in their trial briefs. Our review of the Johnson survey satisfies us that Mr. Johnson conducted the survey in accordance with the best practices listed earlier in this section. In particular: the survey's universe was properly defined as purchasers or potential purchasers of frozen meals; the survey questions followed the generally-accepted Ever-Ready format by posing non-leading, open-ended questions and by asking appropriate follow-up questions, *see Union Carbide Corp. v. Ever-Ready, Inc.*, 531 F.2d 366 (7th Cir. 1976); and the survey employed an acceptable control. For example, after being shown a stimulus card on which was printed "SMART BALANCE" for the test group and "RIGHT BALANCE" for the control group, interviewers asked respondents the following "source" question:

---

[85] Sabol, pp. 47-48, 60 TTABVUE 51-52.

[86] Kaplan II, pp. 47-49, 86 TTABVUE 52-54.

Based upon what you just saw, who or what company do you believe makes the frozen meal product with the name that I showed you OR do you not have a belief?

The "source" question was followed up by a question that probed the basis for the respondent's answer to the initial question and then further questions asking whether the respondent believed the product was related to other products in the same family or was the subject of a licensing arrangement with another company.[87] We also note Mr. Johnson's testimony that he contracted with an independent entity to validate the survey results and his inclusion of validation results in his report.[88]

Finally, Mr. Johnson testified that he attempted to determine whether mentions of WEIGHT WATCHERS frozen meals by respondents in his survey should be counted as references to SMART ONES products due to marketplace partnering of the marks. Because mentions of "WEIGHT WATCHERS" in both the test group and the control group were virtually equal at 6% and 7% respectively, he classified those responses as "market share mentions," that is, mentions prompted by the market share strength of "WEIGHT WATCHERS" in the "health and diet-conscious product offerings" category. Had the mentions been related to the SMART ONES mark, he would have expected to see significant variation in the number of mentions between the test group ("SMART BALANCE") and the control group ("RIGHT BALANCE").

---

[87] Johnson II, pp. 45-46, 87 TTABVUE 49-50.

[88] *Id.*, pp. 47-48.

He concluded that mentions of "WEIGHT WATCHERS" by survey respondents did not affect his finding of little or no likelihood of confusion.[89]

To the extent that Dr. Sabol criticizes the Johnson survey in his testimony deposition, he asserts that the Johnson survey was designed to elicit "Don't know" responses and that the survey did not replicate marketplace conditions because it only gave respondents a brief view of Applicant's mark.[90] Dr. Sabol objected to the instructions read to the Johnson survey respondents which coupled the admonition not to guess when responding to survey questions with the assurance that "Don't know" is an acceptable answer. Dr. Sabol explained that he believes the effect of the instructions was to suggest that there is a right and a wrong answer and, rather than guessing, respondents took refuge in the "Don't know" response.[91] In other words, Dr. Sabol objects to the fact that the Johnson survey attempted to prevent respondents from guessing. Responses that represent guesses contribute to noise in a survey, and the instructions given in the Johnson survey are a common safeguard to prevent the problem.[92] Dr. Sabol's remaining criticism has to do with the fact that interviewers for the Johnson survey removed the stimulus card with "SMART BALANCE" from participants after a brief view and that is not how consumers would be exposed to a mark in the marketplace. This sort of "memory test" is not

---

[89] *Id*. at pp. 54-55 and Ex. 2, pp. 18-20.

[90] Sabol, pp. 70-87, 60 TTABVUE 56-73.

[91] *Id*. at p. 75.

[92] Diamond at pp. 249-50.

uncommon and generally replicates marketplace conditions under which a consumer would make a casual, not particularly deliberate purchasing decision.[93] Accordingly, we give little weight to Dr. Sabol's criticisms of the Johnson survey.

Overall, the deficiencies in the Sabol survey lead us to disregard the survey results and Dr. Sabol's opinion regarding the presence of likely confusion in this case while we find that the Johnson survey and the expert opinions of Dr. Kaplan and Mr. Johnson support a conclusion that confusion is not likely.

### F. Weighing the factors.

The significant differences between the parties' marks in sound, appearance, meaning and commercial impression, particularly in light of the uncontested long history of conflict-free co-existence of the parties' marks applied to healthy food items (albeit not frozen foods), and the corroborative nature of the Johnson survey and expert testimony, outweigh any inference of likelihood of confusion raised by the overlap in goods and channels of trade, and the moderate to low degree of purchasing care exercised. On balance, and taking into account the totality of the evidence of record, we find that Opposers have failed to prove likelihood of confusion by a preponderance of the evidence.

## VII. Likelihood of dilution.

Dilution by blurring is "association arising from the similarity between a mark or trade name and a famous mark that impairs the distinctiveness of the famous mark." Trademark Act § 43(c)(2)(B); 15 U.S.C. § 1125(c)(2)(B). Dilution may be

---

[93] *See* McCarthy at § 32:171.

likely "regardless of the presence or absence of actual or likely confusion, of competition, or of actual economic injury." Trademark Act § 43(c)(1); 15 U.S.C. § 1125(c)(1). Our primary reviewing court, the U.S. Court of Appeals for the Federal Circuit, has set forth the following four elements a plaintiff must prove in a Board proceeding in order to prevail on a claim of dilution by blurring:

> (1) the plaintiff owns a famous mark that is distinctive; (2) the defendant is using a mark in commerce that allegedly dilutes the plaintiff's famous mark; (3) the defendant's use of its mark began after the plaintiff's mark became famous; and (4) the defendant's use of its mark is likely to cause dilution by blurring.

*Coach Servs. Inc. v. Triumph Learning LLC*, 668 F.3d 1356, 101 USPQ2d 1713, 1723-24 (Fed. Cir. 2012).

"A mark can acquire 'sufficient public recognition and renown to be famous for purposes of likelihood of confusion without meeting the more stringent requirement for dilution fame.'" *Coach* at 1724 (*quoting 7-Eleven Inc. v. Wechsler*, 83 USPQ2d 1715, 1722 (TTAB 2007)). Where, as here, a mark is not proven famous for purposes of likelihood of confusion, it will certainly not meet the higher threshold for fame required to prove dilution. Additionally, the Board generally accepts and considers evidence related to fame of the plaintiff's mark up to the time of trial when considering likelihood of confusion. This is distinct from a claim of dilution where an element of the claim is the acquisition of fame prior to the defendant's first use or application filing date. *Gen. Mills Inc. v. Fage Dairy Processing Indus. SA*, 100 USPQ2d 1584, 1595 n.13 (TTAB 2011). In this case, only evidence purporting to show fame of "SMART ONES" as of November 3, 2009, the date the involved applications were filed, may be relied upon to prove fame for purposes of the

dilution claim. Opposers cite to the previously-referenced 2007 and 2008 confidential sales figures and 2008 confidential promotional and advertising expenditures for SMART ONES products, but, as previously explained, those figures do not assist us in evaluating the fame of the SMART ONES mark. Accordingly, we find that Opposers have not carried their burden of proof with regard to the fame element.

**Decision:** The opposition is dismissed.

Opposers are allowed 30 days from the mailing date of this decision to refile the Findlay deposition transcript separating the confidential testimony from the non-confidential testimony pursuant to the instructions in TBMP § 120.02, failing which the above-noted transcript will be made available to the public.